UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

THE VAPING DRAGON LLC, d/b/a
THE VAPING DRAGON,

      Plaintiff,

v.

U.S. FOOD AND DRUG
ADMINISTRATION, et al.,

      Defendants.

No. 1:25-CV-081-H

## MEMORANDUM OPINION AND ORDER

In 2024, the U.S. Food and Drug Administration launched an ongoing enforcement proceeding against The Vaping Dragon, an Abilene-based tobacco retailer, seeking civil money penalties for alleged violations of federal law. Under the Federal Food, Drug, and Cosmetic Act (FDCA) and related statutes, FDA may resolve the matter in-house before an administrative law judge that it employs. Through this lawsuit, Vaping Dragon collaterally attacks that administrative proceeding, alleging that FDA's civil money penalty scheme for tobacco products violates the company's Seventh Amendment right to a jury trial. Vaping Dragon seeks declaratory relief and an injunction barring the defendants from adjudicating civil money penalties against the company in an agency tribunal, not an Article III court.

First, the Court has jurisdiction over this case. In crafting the review provisions for final FDA orders, Congress did not implicitly preclude district court review of constitutional claims like this one. On the merits, FDA's civil money penalty scheme triggers the Seventh Amendment because it is a "suit at common law," especially after *SEC v. Jarkesy*, 603 U.S. 109 (2024). And that scheme does not involve "public rights," which do not require a jury trial. Thus, Vaping Dragon is entitled to a jury in an Article III court.

Accordingly, the Court denies the defendants' motion for summary judgment (Dkt. No. 11), converts Vaping Dragon's motion for preliminary injunction into a motion for summary judgment (Dkt. No. 3), and enters final judgment for Vaping Dragon on the merits. The defendants are permanently enjoined from adjudicating civil money penalties against Vaping Dragon in an administrative proceeding. Therefore, the defendants are also enjoined to dismiss with prejudice the administrative complaint against Vaping Dragon. The company's request for a declaratory judgment, however, is denied. Because the Court enjoins the defendants from seeking civil money penalties against Vaping Dragon in an administrative proceeding, a declaratory judgment would provide no further relief.

## 1.    Factual and Procedural Background

### A.    Statutory Framework

FDA first tried to regulate tobacco 30 years ago. In 1996, the agency finalized a rule targeting nicotine, the primary addictive substance in cigarettes and other tobacco products. *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 272 (D.C. Cir. 2019) (citing Regulations Restricting the Sale and Distribution of Cigarettes and Smokeless Tobacco to Protect Children and Adolescents, 61 Fed. Reg. 44,396, 44,398–99 (Aug. 28, 1996)). The rule concluded that nicotine was a "drug" under the FDCA. 61 Fed. Reg. at 44,397 (noting nicotine's pharmacological effects). With that finding, FDA asserted authority—despite having disclaimed such power for decades—to regulate tobacco products as drug delivery devices. *Id.* at 44,400; *see FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 550 (2025).

The strategy was short-lived. Four years after FDA issued its final rule, the Supreme Court held in *FDA v. Brown & Williamson Tobacco Corp.* that Congress never authorized the agency to regulate tobacco. 529 U.S. 120, 126 (2000). In fact, when it enacted the FDCA,

Congress meant to "exclude" tobacco products from FDA's reach.  *Id.* at 142.  Changes to the regulatory scheme were left to the political process.

Congress responded with the Family Smoking Prevention and Tobacco Control Act, commonly known as the TCA.  *See* Pub. L. No. 111-31, 123 Stat. 1776 (2009).  The TCA amended the FDCA to create a detailed framework for federal tobacco regulation.  At the helm is FDA, which exercises "broad authority to address 'the public health and societal problems caused by the use of tobacco products.'"  *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 438 (5th Cir. 2020) (quoting TCA § 2(7), 123 Stat. at 1777).  Today, FDA has the authority that the Supreme Court rejected in *Brown & Williamson*: namely, the power to control the sale, distribution, and marketing of tobacco products.

What are those products?  At least "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco."  21 U.S.C. § 387a(b).  But the TCA also authorizes FDA to regulate "any other tobacco products" that the agency "by regulation deems" to meet the statutory requirements.  *Id.*  In 2016, FDA exercised that authority by issuing a regulation—the Deeming Rule[1]—that subjected electronic nicotine delivery systems (ENDS), often called vaping products or e-cigarettes, to the TCA.  *See Big Time Vapes*, 963 F.3d at 439–40.

The TCA imposes several requirements on ENDS manufacturers.  Relevant here, the statute prohibits them from marketing or selling any "new tobacco product" without first

---

[1]  *See* Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products ("Deeming Rule"), 81 Fed. Reg. 28,973 (May 10, 2016).  Several courts, including the Fifth Circuit, have rejected industry challenges to the Deeming Rule.  *See, e.g., Big Time Vapes*, 963 F.3d at 444 (holding that the FDA's deeming authority does not violate the non-delegation doctrine); *Nicopure Labs*, 944 F.3d at 273–76, 281–82 (explaining that applying the Deeming Rule to ENDS products is not arbitrary or capricious under the Administrative Procedure Act).

receiving premarket authorization from FDA. 21 U.S.C. § 387j(a)(2). A tobacco product is "new" if it "was not commercially marketed in the United States as of February 15, 2007." *Id.* § 387j(a)(1)(A). This category typically includes ENDS products: "[T]here were very few (if any) [ENDS] products on the market before February 2007." *Big Time Vapes*, 963 F.3d at 440. Accordingly, ENDS manufacturers must receive premarket authorization before selling or marketing their products, unless an exception applies.[2]

There are "significant penalties" for bypassing these requirements. *FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 229 (2025). Any ENDS product that has not received FDA authorization is "adulterated." 21 U.S.C. § 387b(6). And the "introduction or delivery for introduction into interstate commerce" of any "adulterated" tobacco product is "prohibited." *Id.* § 331(a). Violators face up to one year in prison, a $1,000 fine, or both. *Id.* § 333(a)(1). The adulterated product may also be seized. *Id.* § 334.

Prosecution aside, Congress also empowered FDA to enforce the tobacco-product requirements—including the prohibition on introducing adulterated products into interstate commerce—through administrative proceedings.[3] *See id.* § 333(f)(5); 21 C.F.R. § 17.1(j). FDA is authorized to use such proceedings to assess civil money penalties against "any person who violates a requirement" of the TCA.[4] 21 U.S.C. § 333(f)(9)(A). Each violation entails a penalty of not more than $21,348, with a cap of $1,423,220 for all violations

---

[2] A manufacturer could instead claim that its product is "substantially equivalent" to a product commercially marketed in the United States before February 15, 2007. *See* 21 U.S.C. § 387j(a)(3).

[3] Technically, this authority rests with the Secretary of Health and Human Services. *See* 21 U.S.C. §§ 321(d), 333(f)(5)(A). But the Secretary delegated his power to the Commissioner of Food and Drugs who, in turn, tasked the agency's Center for Tobacco Products with initiating enforcement actions. *Id.* § 393(d)(2); *see* 21 C.F.R. § 17.5(a).

[4] FDA could alternatively impose a "no-tobacco-sale order." 21 U.S.C. § 333(f)(5).

adjudicated in a single proceeding. *See id.*; 45 C.F.R. § 102.3 tbl. 1 (adjusting the statutory caps for annual inflation). For "intentional[]" violations, the "enhanced" penalty rises to $355,806. *See* 21 U.S.C. § 333(f)(9)(B); 45 C.F.R. § 102.3 tbl. 1.

A civil money penalty proceeding begins with an administrative complaint from FDA's Center for Tobacco Products (CTP). 21 C.F.R. § 17.5(a). The proceeding is then assigned to an administrative law judge, or ALJ, who "shall conduct a fair and impartial hearing." *Id.* §§ 17.3(c), 17.5(d). The ALJ issues an "initial decision" that includes, to the extent necessary, "findings of fact, conclusions of law, and the amount of any penalties and assessments imposed." *Id.* § 17.45(a). The ALJ may enter a summary decision—the administrative equivalent of summary judgment—if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. *Id.* § 17.17(b).

The FDCA constrains the ALJ's decision-making. When "determining the amount of a civil penalty," the ALJ "shall" consider several factors—including the circumstances of the violation, the violator's ability to pay, any prior history of violations, and the degree of culpability. 21 U.S.C. § 333(f)(5)(B). And per the FDCA's implementing regulations, the ALJ "does not have the authority to find Federal statutes or regulations invalid." 21 C.F.R. § 17.19(c). These administrative proceedings do not include a jury. *See id.* § 17.19(b).

An aggrieved party may appeal the ALJ's initial decision to a Departmental Appeals Board within the Department of Health and Human Services (HHS). *Id.* § 17.3(g), 17.47. There, three more ALJs decide whether to affirm or reverse the decision below. *See id.*

After exhausting the administrative process, any person "aggrieved by an order assessing a civil penalty" may petition for judicial review in the D.C. Circuit or in any other circuit in which such person resides or does business. 21 U.S.C. § 333(f)(6). The party need

not pay until after judicial review is complete.  *See id.* § 333(f)(7).  But once there has been a "final judgment" in the government's favor (or the 60-day window for initiating judicial review has expired), *id.*, the aggrieved party must pay the penalty, which is "deposited as miscellaneous receipts in the Treasury of the United States."  21 C.F.R. § 17.54.

### B.    Administrative Proceedings Against Vaping Dragon

Vaping Dragon sells ENDS products at a retail store in Abilene, Texas.  Dkt. No. 13-1 at 33.  In 2023, CTP sent Vaping Dragon a letter warning that, upon inspection, one of its products, Why So Cereal, lacked premarket authorization and was therefore adulterated. *Id.*; *see id.* at 36–38.  The letter advised that the identified violations "do not necessarily constitute an exhaustive list."  *Id.* at 37.  CTP told Vaping Dragon to promptly address the violations and to "take any necessary actions to bring [its] tobacco products into compliance" with the FDCA.  *Id.*

A year later, CTP inspectors again observed an adulterated ENDS product at Vaping Dragon's store—this time, a Geek Bar Pulse Berry Bliss.  *Id.* at 33.  Based on the inspection, CTP filed an administrative complaint alleging that Vaping Dragon violated the FDCA by receiving and offering for sale an adulterated ENDS product.  *Id.* at 1–6; *see* 21 U.S.C. § 331(c).  CTP sought the maximum penalty of $21,348.  Dkt. No. 13-1 at 6.

In its answer, Vaping Dragon maintained that it was entitled to a jury trial on CTP's civil-penalty request.  Dkt. No. 3-4 at 2.  It also asserted selective enforcement, claiming that CTP has not sought civil money penalties from "Big Tobacco" companies (specifically, Altria and R.J. Reynolds) that allegedly market unauthorized tobacco products.  *Id.* at 2–3. Lastly, Vaping Dragon argued that the requested penalty was excessive considering the lighter penalties assessed against retailers who sell combustible cigarettes to minors.  *Id.* at 3.

In January 2025, the assigned ALJ issued a scheduling order establishing deadlines for discovery and pre-hearing briefs. Dkt. No. 13-1 at 9–20. The order noted that the ALJ would entertain motions for summary decision. *Id.* at 16–17; *see* 21 C.F.R. § 17.17. As of April 10, 2025, the ALJ had not yet set a hearing. *See* Dkt. No. 13-1 at 26.

### C.    This Lawsuit

In May 2025, Vaping Dragon filed this lawsuit against FDA, HHS, Martin Makary, Commissioner of Food and Drugs, and Robert F. Kennedy, Jr., Secretary of HHS. *See* Dkt. No. 1. In its complaint, Vaping Dragon seeks a declaration that FDA's civil money penalty scheme for tobacco products, as well as the accompanying proceedings against Vaping Dragon, violate the Seventh Amendment. *Id.* ¶ 60. Vaping Dragon also seeks injunctive relief (1) requiring dismissal of the administrative complaint with prejudice; (2) prohibiting HHS and FDA from adjudicating civil money penalties against Vaping Dragon in an administrative proceeding; and (3) barring HHS and FDA from adjudicating civil money penalties in administrative proceedings entirely. *Id.* It also requests attorneys' fees. *Id.*

At the same time, Vaping Dragon moved for a preliminary injunction staying the ongoing administrative proceeding until this case is finally resolved. Dkt. No. 3 at 1. FDA opposed the motion and moved for summary judgment. Dkt. No. 11. Because no material facts are in dispute and the issues presented are pure questions of law, the Court informed the parties that it intended to convert Vaping Dragon's motion for preliminary injunction into a motion for summary judgment and enter final judgment on the merits. Dkt. No. 24; *see* Fed. R. Civ. P. 65(a)(2). The parties were given one week to object to that approach. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (requiring that parties "receive clear and unambiguous notice" of the court's intent to consolidate (quotation omitted)). Neither did.

Thus, the Court converts Vaping Dragon's motion for preliminary injunction (Dkt. No. 3) into a motion for summary judgment. The motions are fully briefed and ready for decision. *See* Dkt. Nos. 3-1; 12; 21; 22.

## 2.    Legal Standards

### A.    Permanent Injunction

The permanent-injunction standard is "essentially the same" as for a preliminary injunction. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). "A party seeking a permanent injunction must show: (1) that it has succeeded on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021); *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The requesting party must "'clearly carr[y] the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (quotations omitted).

### B.    Summary Judgment

A movant is entitled to summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment is appropriate where the only issue before the court is a pure question of law." *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991).

## 3.    Jurisdiction

"Jurisdiction is always first." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 466 (5th Cir. 2024) (quotation omitted). So before touching the merits, the Court must confirm its authority to decide this case. *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). Here, FDA maintains that Congress withdrew the Court's jurisdiction

to resolve Vaping Dragon's Seventh Amendment claim.  Dkt. No. 12 at 15–19.  This claim, the agency continues, is reviewable only in a court of appeals.  *Id.* at 14.  FDA is wrong.

### A.    Implicit Preclusion

The Constitution vests Congress with the authority "[t]o constitute Tribunals inferior to the supreme Court."  U.S. Const. art. I, § 8, cl. 9; *see also id.* art. III, § 1.  This "greater power to create lower federal courts includes its lesser power to 'limit the jurisdiction of those Courts.'"  *Patchak v. Zinke*, 583 U.S. 244, 252 (2018) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 33 (1812)).  So long as it acts within constitutional limits, Congress may choose what cases the lower federal courts can consider, including "when, and under what conditions," the courts can hear them.  *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007).  Congress used this authority to give district courts jurisdiction over all civil cases arising under the Constitution and federal law.  28 U.S.C. § 1331; *see* U.S. Const. art. III, § 2, cl. 1.

What Congress gives, however, it can usually take away.  This principle is no less true when it comes to jurisdiction.  *See Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850).  Sometimes, Congress precludes jurisdiction explicitly, "providing in so many words that district court jurisdiction will yield."  *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023).  Other times, it does so implicitly, leaving courts to divine Congress' intent from the "text, structure, and purpose" of the relevant statutes.  *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)).

With challenges to agency action, Congress may implicitly preclude district court jurisdiction by funneling claims to an "alternative scheme of review."  *Axon*, 598 U.S. at 185.  Most commonly, this scheme involves exhausting the agency's own review process before seeking direct judicial review of the agency's final decision in a court of appeals.  *See,*

*e.g.*, *id.*; 15 U.S.C. § 78y(a)(1); *see also* Joseph W. Mead & Nicholas A. Fromherz, *Choosing a Court to Review the Executive*, 67 Admin. L. Rev. 1, 15 (2015) (estimating that most of "more than a thousand" federal statutes direct agency cases "to a regional circuit court, to the D.C. Circuit, or, in limited instances, to the Federal Circuit"). The Supreme Court and the Fifth Circuit have held that this scheme—where litigants leapfrog straight from the agency to the circuit—may strip district courts of their ordinary power to resolve agency claims under their federal-question jurisdiction. *See, e.g.*, *Thunder Basin*, 510 U.S. at 207–12; *Elgin*, 567 U.S. at 10–15; *Bank of La. v. Fed. Deposit Ins. Co.*, 919 F.3d 916, 923–30 (5th Cir. 2019).

Even so, that kind of statutory review scheme "does not necessarily extend to every claim concerning agency action." *Axon*, 598 U.S. at 185. District courts must undertake a "complex analysis" to determine whether the "claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Bank of La.*, 919 F.3d at 923 (alteration in original) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010)). If so, the district court lacks jurisdiction to resolve the claim. If not, it may proceed to the merits.

To guide this inquiry, the Supreme Court in *Thunder Basin* identified three relevant factors: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim lies "outside the agency's expertise." 510 U.S. at 212–13 (internal quotations and citation omitted); *see Bank of La.*, 919 F.3d at 923. "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.'" *Axon*, 598 U.S. at 186 (quoting *Free Enter. Fund*, 561 U.S. at 489). But Congress may have envisioned district court review even if the factors cut different

– 10 –

ways.  *Id.*  In the end, the "ultimate question" is "whether the statutory review scheme,

though exclusive where it applies, reaches the claim in question."  *Id.*

## B.    The *Axon* Analysis

The Supreme Court recently elaborated on the implicit-preclusion analysis in *Axon*.

*Axon* involved two related challenges to administrative enforcement proceedings before the

Securities and Exchange Commission (SEC) and the Federal Trade Commission (FTC).

598 U.S. at 180–81.  In both instances, the plaintiff claimed that the Commission was

unconstitutionally structured—specifically, that double-for-cause removal protections for the

agencies' ALJs violated the separation of powers.[5]  *Id.* at 182–83.  These alleged structural

violations, the argument went, tainted the administrative proceedings no matter their

outcome.  *Id.* at 182–83.  All agreed that the plaintiffs could raise their constitutional

challenges before the applicable Commission and then (if needed) in a federal court of

appeals.  *Id.* at 181; *see* 15 U.S.C. § 78y(a)(1) (providing that "[a] person aggrieved by [an

SEC] final order . . . may obtain review of the order" by filing a petition in a court of

appeals); *Id.* § 45(c) (similar for the FTC).  But like Vaping Dragon, the plaintiffs

sidestepped that process by suing in a district court, seeking to enjoin the Commission's

proceeding.  *Axon*, 598 U.S. at 182.  The question, then, was whether the statutory review

schemes precluded the district court from exercising jurisdiction over the plaintiffs'

constitutional claims.

---

[5] The plaintiff in the FTC case also challenged the Commission's combination of prosecutorial and
adjudicative functions.  *See Axon*, 598 U.S. at 183.

The answer was no. The statutory review schemes for the SEC and FTC—though exclusive for certain claims—do not implicitly withdraw a district court's jurisdiction to resolve the kinds of structural constitutional challenges raised in *Axon*. *Id.* at 185.

The Supreme Court reached that conclusion through a two-step analysis. *See id.* at 189. It first took a "30,000-foot view of the issue" by comparing the plaintiffs' claims to those in its prior implicit-preclusion cases. *Id.* at 188–89. In two cases, *Thunder Basin* and *Elgin*, the Supreme Court held that the claims were committed to a statutory review scheme. *Id.* In another, *Free Enterprise Fund*, the Supreme Court approved district court jurisdiction despite the availability of direct circuit-level review. *Id.* The *Axon* Court reasoned that the plaintiffs' claims were more like the claim in *Free Enterprise Fund*—they all challenged "the structure or very existence of an agency." *Id.* at 189. Seeing no reason to treat them differently, the Supreme Court concluded that the review schemes at issue did not foreclose district court jurisdiction to resolve the plaintiffs' "sweeping constitutional claims." *Id.*

The *Axon* Court "[came] out in the same place" when, at the second step, it applied the *Thunder Basin* factors. *Id.* All three factors pointed toward allowing district court review of the plaintiffs' claims "that the structure, or even existence, of an agency violates the Constitution." *Id.* at 195. In other words, the "more granular" inquiry confirmed what precedent already compelled: district courts retain jurisdiction to resolve collateral disputes over structural constitutional issues that have little to do with agency policy. *Id.* at 189; *see Cochran v. SEC*, 20 F.4th 194, 212 (5th Cir. 2021) (en banc) ("[T]he *Thunder Basin* inquiry simply reaffirms that *Free Enterprise Fund* controls this case and that [the] removal power claim is within the district court's jurisdiction."), *aff'd sub nom.*, *Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023).

Like other courts post-*Axon*, the Court begins with the comparative analysis before diving into *Thunder Basin*. *See, e.g.*, *Asbury Auto. Grp., Inc. v. FTC*, No. 4:24-CV-950, 2025 WL 2317455, at *5–7 (N.D. Tex. Aug. 11, 2025) (O'Connor, C.J.).

### i.    At a "30,000-foot view," the claim here is most like those in *Axon* and *Free Enterprise Fund*.

Looking at the issue from 30,000 feet, Vaping Dragon's Seventh Amendment claim is of the same ilk as the claims in *Axon* and *Free Enterprise Fund*. *See Axon*, 598 U.S. at 188–89. Making sense of that conclusion requires some background. So, before turning to the specifics of this case, the Court begins with the relevant precedents.

### a.    *Axon* and *Free Enterprise Fund*

*Axon* and *Free Enterprise Fund* both involved challenges to double-for-cause removal protections. With such arrangements, a subordinate agency official may be removed only for good cause. What constitutes good cause is determined by a higher-level entity within the agency, whose members themselves can only be removed by the President for good cause. As a result, the ultimate decisionmaker—the President—is stripped of his power to hold the subordinate officials accountable. In *Axon*, the subordinate officials were ALJs. *Id.* at 182–83. In *Free Enterprise Fund*, they were members of the Public Company Accounting Oversight Board—a nonprofit corporation overseen by the SEC that supervises the audits of U.S. public companies. 561 U.S. at 485, 495–96. But the claims were otherwise the same: the plaintiffs all argued that the subordinate officials' "freedom from Presidential oversight" rendered unconstitutional "all power and authority [the agency] exercised." *Id.* at 508.

These claims are best understood as "structural" challenges. They did not "depend on the validity of any substantive aspect" of a federal statute, rule, or regulation. *Cochran*, 20 F.4th at 207. Nor did they have any bearing on whether the plaintiffs were liable in the

underlying administrative proceedings—say, for violating the Securities Exchange Act (*Axon*) or for engaging in illicit accounting practices (*Free Enterprise Fund*). *Id.* That is, the claims went to the "structure or very existence of an agency," not the "substantive decision[s]" that Congress viewed as within an agency's particular expertise. *Axon*, 598 U.S. at 189. The claims were also structural in a different sense—they touched on the broader allocation of power across our government. After all, the "structural principles secured by the separation of powers protect the individual as well." *Bond v. United States*, 564 U.S. 211, 222 (2011). To put it plainly: structural claims, like those in *Axon* and *Free Enterprise Fund*, "charge that an agency is wielding authority unconstitutionally in all or a broad swath of its work." *Axon*, 598 U.S. at 189.

As Chief Judge O'Connor recently explained, the "structural defects" identified in *Axon* and *Free Enterprise Fund* pose a "fruit-of-the-poisonous-tree" problem. *Wulferic, LLC v. FDA*, 793 F. Supp. 3d 830, 840 (N.D. Tex. 2025) (concluding that FDA's civil money penalty scheme for tobacco products violates the Seventh Amendment). "Because part of the agency is tainted, all work carried out under that (unconstitutional) authority is tainted as well." *Id.*; *see Axon*, 598 U.S. at 189. And it is not as simple as putting the proverbial genie back in the bottle. "[B]eing subjected to unconstitutional agency authority" in an administrative proceeding is itself a "'here-and-now injury.'" *Axon*, 598 U.S. at 191 (internal quotation marks omitted) (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020)). A regulated party's "right[] not to undergo the complained-of agency proceedings" therefore cuts in favor of collateral district-court review. *Id.* at 192.

**b.**    ***Thunder Basin* and *Elgin***

Now contrast those cases with *Thunder Basin* and *Elgin*.  In *Thunder Basin*, a coal company filed suit in federal district court challenging its apparent obligations under the Mine Act to provide union officials with access to the workplace.  510 U.S. at 204–05.  According to the coal company, these requirements conflicted with its rights under the National Labor Relations Act.  *Id.*  The company also objected on due process grounds, arguing that federal regulators could not impose a fine before holding a hearing.  *See id.*

Typically, Mine Act claims are brought before the Federal Mine Safety and Health Review Commission and then (if necessary) a court of appeals.  *Id.* at 204 (citing 30 U.S.C. §§ 815, 816, 823).  Relying extensively on the Mine Act's legislative history, the Supreme Court required the coal company to engage the Act's alternative review scheme, holding that the district court lacked jurisdiction over both claims.  *Id.* at 209–11, 215–16.  "The Commission, [the Supreme Court] emphasized, had 'extensive experience' in addressing the statutory issues raised, and could resolve them in ways that 'brought to bear' its 'expertise' over the mining industry."  *Axon*, 598 U.S. at 187 (quoting *Thunder Basin*, 510 U.S. at 214–15).  The Supreme Court acknowledged that the Commission's proficiency in mining law was less helpful for resolving the company's due-process claim.  *Id.* (citing *Thunder Basin*, 510 U.S. at 215).  But it concluded still that the claim could be "meaningfully addressed in the Court of Appeals."  *Thunder Basin*, 510 U.S. at 215.

*Elgin* is similar.  There, a statute allowed federal employees challenging discharge decisions to seek review before the Merit Systems Protection Board and, ultimately, the Federal Circuit.  567 U.S. at 6 (citing 5 U.S.C. §§ 7513(d), 7703(a)(1)).  Yet Elgin sued in district court after he was fired for failing to register for the draft.  *Id.* at 7.  The applicable

– 15 –

draft law, Elgin argued, violated the Equal Protection Clause because it excluded women. *Id.* Although Elgin's claim presented a constitutional question, the Supreme Court held that it was committed to the MSPB—part of a "comprehensive system for reviewing personnel action taken against federal employees." *Id.* at 5 (quoting *United States v. Fausto*, 484 U.S. 439, 455 (1988)). Much like *Thunder Basin*, the Supreme Court emphasized the MSPB's comparative know-how: "A challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB." *Id.* at 22. Similarly, the Supreme Court "observed that such an action could involve 'threshold' and other 'questions unique to the employment context' that 'fall[] squarely within the MSPB's expertise.'" *Axon*, 598 U.S. at 187 (alteration in original) (quoting *Elgin*, 567 U.S. at 22–23). Thus, when a claim implicates an agency's "distinctive knowledge," it is likely to fall within an alternative review scheme. *See id.* at 186.

### c.     This Case

With that background, recall the 30,000-foot analysis: Is Vaping Dragon's Seventh Amendment challenge akin to *Axon* and *Free Enterprise Fund*? Or is it more like *Thunder Basin* and *Elgin*? In short, it is the former.

On the surface, Vaping Dragon's Seventh Amendment challenge looks identical to the due-process claim in *Thunder Basin*. *Wulferic*, 793 F. Supp. 3d at 841. "[B]oth could be framed as alleging that the agency's enabling statute is void of a procedural protection." *Id.* Viewed that way, this issue appears easy. The Supreme Court held in *Thunder Basin* that the due process claim could be "meaningfully addressed" in a court of appeals. 510 U.S. at 215. Moreover, the *Axon* Court expressly doubted that challenges to an agency's "commonplace procedures" are "'of the type'" thought to fall outside a statutory review scheme. 598 U.S.

at 186, 189 (quoting *Thunder Basin*, 510 U.S. at 208, 212). Unsurprisingly, FDA leans on the procedural framing, arguing that "Vaping Dragon does not challenge 'the structure or very existence of' FDA" or "contend the 'agency is wielding authority unconstitutionally in all or a broad swath of its work.'" Dkt. No. 12 at 19 (quoting *Axon*, 598 U.S. at 189).

FDA's argument, however, rests on a false premise. While the Seventh Amendment has procedural undertones, it is structural in nature. As discussed more below, the premise of Vaping Dragon's challenge is that FDA's civil money penalties trigger the jury right because they are "[s]uits at common law." U.S. Const. amend. VII. If Vaping Dragon is right, major structural consequences follow. "The Constitution prohibits Congress from 'withdraw[ing] from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law." *Jarkesy*, 603 U.S. at 127 (alteration in original) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856)). Therefore, if FDA's civil money penalty scheme counts as a suit at common law, then "an Article III court must decide it" with a jury. *Id.*; *see Wulferic*, 793 F. Supp. 3d at 842. Any attempt to funnel that suit elsewhere—say, a juryless administrative tribunal—would run afoul of the Constitution.

The Article III implications highlight that the Seventh Amendment is not solely about procedural protection of individual rights; it also furthers structural ends. Critically, the "Seventh Amendment's jury-trial right does not work alone." *Jarkesy*, 603 U.S. at 141 (Gorsuch, J., concurring). "It operates together with Article III," dictating how and when claims must be subject to judicial, as opposed to administrative, review. *See id.*; *see also id.* at 171 (Sotomayor, J., dissenting) (recognizing that a Seventh Amendment claim is "rooted in Article III and the separation of powers"). As the Fifth Circuit put it, "[t]he test for whether

– 17 –

an Article III court is necessary for an action at law is the same as the test for whether a party has a Seventh Amendment right to a jury trial." *In re Clay*, 35 F.3d 190, 194 (5th Cir. 1994) (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989)).

What does the Seventh Amendment's symbiotic relationship with Article III mean for jurisdiction?  Most notably, it shows that this case is most like *Axon* and *Free Enterprise Fund*.  The Seventh Amendment analysis goes to whether a particular non-judicial forum (an administrative tribunal) can constitutionally resolve a certain type of suit (an action to impose a civil money penalty).  If the answer is no, then the proceeding is "illegitimate," thereby causing the "here-and-now injury of subjection to an unconstitutionally structured decisionmaking process."  *Axon*, 598 U.S. at 191–92 (internal quotation marks omitted).  On that understanding, Vaping Dragon's Seventh Amendment claim is hardly different than the challenges to double-for cause removal protections in *Axon* and *Free Enterprise Fund*.  All these arguments allege that structural flaws rooted in the constitutional separation of powers infect the decisional process beyond repair.

These were not the kinds of questions at issue in *Thunder Basin* and *Elgin*.  Those cases involved challenges to a "specific substantive decision" implicating unique agency expertise—for example, "fining a company," as was true in *Thunder Basin*, or "firing an employee," as was the case in *Elgin*.  *Id.* at 189.  But a Seventh Amendment claim like Vaping Dragon's does not allege injury "from this or that ruling."  *Id.* at 195.  It stems from "subjection to all agency authority."  *Id.*  The ensuing "here-and-now harm would remain no matter how much [agency] expertise could be 'brought to bear.'"  *Id.* (quoting *Thunder Basin*, 510 U.S. at 215).  Put another way, a case is more like *Axon* and *Free Enterprise Fund* (and less like *Thunder Basin* and *Elgin*) when the charge is that "an agency is wielding

– 18 –

authority unconstitutionally in all or a broad swath of its work." *Id.* at 189.  In such cases, the constitutional claim may be raised in a district court outside the statutory structure.

To hear FDA tell it, that is not the situation here.  It asserts that Vaping Dragon challenges only "a fraction of the agency's work implementing the TCA and a sliver of its overall responsibilities." Dkt. No. 22 at 3.  The agency's briefing, however, gives a different impression.  Proceedings to enforce the TCA's premarket authorization requirements for ENDS products are among "FDA's highest enforcement priorities."  Dkt. No. 12 at 12.  In fact, "[c]ivil money penalties are one of CTP's most effective tools to enforce the TCA."  *Id.* at 11; *see also id.* (noting that CTP has brought over 37,000 administrative actions seeking a civil money penalty as of May 2025).  It is hard to see how a challenge to these penalties does not strike at a "broad swath" of FDA's work.  *See Axon*, 598 U.S. at 189.

In short, Vaping Dragon's Seventh Amendment challenge is less like *Thunder Basin* and *Elgin* and more like *Axon* and *Free Enterprise Fund*.  Therefore, as was true in *Axon*, the "30,000-foot view" points toward resolving this case on the merits.  *Id.*

### ii.    The *Thunder Basin* factors also favor the Court's jurisdiction.

Zooming in, application of the *Thunder Basin* factors confirms what the "30,000-foot view" already suggests.  *Id.*  Each factor signals that the Court retains jurisdiction here.

### a.    Could precluding district court jurisdiction foreclose all meaningful judicial review?

Start with the first question: whether preclusion of district court jurisdiction "could foreclose all meaningful judicial review."  *Thunder Basin*, 510 U.S. at 212–13.  According to Vaping Dragon, waiting to raise its Seventh Amendment challenge in a court of appeals is simply not an option.  Its alleged harm is subjection to an unconstitutional proceeding—one where findings of fact are made by an ALJ, not a jury.  Dkt. No. 21 at 10.  There can be no

meaningful remedy in a court of appeals, the argument goes, because the alleged harm will have already occurred.  *Id.*  FDA disagrees, arguing that the Fifth Circuit can adequately review Vaping Dragon's Seventh Amendment claim via a petition for review of an ALJ's final order assessing a civil money penalty against the company.  Dkt. No. 12 at 15–16.

On this score, *Axon* is virtually dispositive.  Just like Vaping Dragon, the regulated parties in *Axon* claimed harm from "subjection to an illegitimate proceeding, led by an illegitimate decisionmaker."  *Axon*, 598 U.S. at 191.  That "'here-and-now injury,'" the Supreme Court emphasized, "is impossible to remedy once the proceeding is over, which is when appellate review kicks in."  *Id.* (quoting *Seila Law*, 591 U.S. at 212).  Indeed, a structural constitutional flaw persists even if the regulated party *wins* before the agency.  *Id.*  For such grievances, "the court of appeals can do nothing: A proceeding that has already happened cannot be undone."  *Id.*

This case is just the same.  Vaping Dragon seeks injunctive relief preventing it from having to incur the time and expense of an allegedly unconstitutional proceeding.  *See* Dkt. Nos. 1 ¶ 60; 3.  Without such relief, the company would be forced to undergo an illegitimate proceeding that cannot be remedied after the fact.  Yes, Vaping Dragon could invoke the Seventh Amendment on appellate review from an adverse FDA decision.  But that review "would come too late to be meaningful."  *Axon*, 598 U.S. at 191.  Even if the Fifth Circuit agreed with Vaping Dragon, vacated the FDA's order, and required a jury trial before the agency could impose a civil money penalty, the company will still have been subjected to an unconstitutional proceeding.  As the Fifth Circuit recently noted, there is a lack of authority "supporting the proposition that the constitutional guarantee of a jury trial is honored by a trial occurring after an agency has already found the facts, interpreted the law, adjudged

guilt, and levied punishment." *AT&T, Inc. v. FCC*, 149 F.4th 491, 503 (5th Cir. 2025), *cert. granted*, 2026 WL 73092 (U.S. Jan. 9, 2026); *see United States v. Sagoo*, No. 4:24-CV-1159, 2025 WL 2689912, at *3 (N.D. Tex. Sept. 19, 2025) (O'Connor, C.J.). If Vaping Dragon is to have meaningful judicial review of a Seventh Amendment claim for injunctive relief, it must come from this Court before being subjected to an allegedly unconstitutional proceeding.

FDA lodges several counterarguments, none of which are persuasive. First, it notes that the Seventh Amendment claim in *Jarkesy* reached the Supreme Court via the alternative review scheme for final SEC orders, suggesting that Vaping Dragon may obtain review in "the same way." Dkt. No. 12 at 16. Two problems there. For one, unlike the plaintiff in *Jarkesy*, Vaping Dragon is not seeking vacatur of a final agency order levying a civil money penalty. *See Jarkesy*, 603 U.S. at 119. It asks the Court to enjoin a future unconstitutional proceeding. *See* Dkt. No. 1 ¶ 60. Moreover, FDA's reliance on *Jarkesy* puts the cart before the horse. The FDCA only permits a "person . . . who is *aggrieved by* an order assessing a civil penalty" to "file a petition for judicial review of such order." 21 U.S.C. § 333(f)(6) (emphasis added). FDA's argument therefore assumes that the agency will prevail in the underlying administrative proceeding.

But what if Vaping Dragon wins? On FDA's view, there would be no way for the company to challenge its subjection to an unconstitutional proceeding. Under both *Axon* and Fifth Circuit en banc precedent, that is no answer. *See Axon*, 598 U.S. at 191; *Cochran*, 20 F.4th at 209 ("The Exchange Act's statutory-review scheme does not guarantee [the plaintiff] meaningful judicial review of her claim because the enforcement proceedings will not necessarily result in a final adverse order," which is a "prerequisite for judicial review"

– 21 –

under the statutory scheme.).  For there to be meaningful judicial review of its Seventh Amendment claim, Vaping Dragon must be able to raise that challenge win or lose.

Second, and relatedly, FDA cites to *Texas Tobacco Barn, LLC v. U.S. Department of Health & Human Services*, a case pending at the Fifth Circuit that squarely raises the same Seventh Amendment issue.  *See* Dkt. No. 12 at 16; No. 25-60200, Dkt. No. 1-1 at 2 (5th Cir. Apr. 16, 2025).  That case, unlike this one, arose out of a petition for review from a final FDA decision imposing a civil penalty.  The implication, then, is that Vaping Dragon can also receive meaningful judicial review via a petition to the Fifth Circuit.  Again, this argument ignores the injury claimed.  Vaping Dragon wants prospective relief: the alleged harm "is the process itself," not a penalty that has already been imposed.  *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 771 (5th Cir. 2025).  Therefore, Vaping Dragon can only obtain meaningful judicial review before it "must endure an unconstitutional proceeding— an injury that 'cannot be undone' ex post."[6]  *Id.* (quoting *Axon*, 598 U.S. at 191).

Third, FDA invokes two district court decisions—one from D.C. and another from California—where the court concluded that it lacked jurisdiction to resolve similar Seventh Amendment objections to FDA's civil money penalty regime for tobacco products.  *E.g.*, Dkt. No. 12 at 18 (first citing *Vape Cent. Grp., LLC v. FDA*, Civ. A. No. 24-3354, 2025 WL 637416 (D.D.C. Feb. 27, 2025); then citing *Huff & Puffers, LLC v. FDA*, No. 8:24-CV-2110, 2025 WL 1092696 (C.D. Cal. Feb. 27, 2025)).  To state the obvious, the Court is not bound

---

[6] Qualified-immunity doctrine provides a useful analogy.  *See Axon*, 598 U.S. at 192.  In that context, the Supreme Court recognizes "an entitlement not to stand trial or face the other burdens of litigation."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  That privilege is "effectively lost if a case is erroneously permitted to go to trial."  *Id.*  Thus, the Supreme Court has blessed interlocutory appellate review of pretrial orders denying qualified immunity; otherwise, the harm of undergoing an illegitimate proceeding cannot later be undone.  *Id.* at 526–27.  Similar reasoning applies here.

by these decisions. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). Nor does it find them persuasive. Both decisions treat the Seventh Amendment as a mere procedural protection despite its structural implications. *See supra*, Section 3.B.i.c. And both decisions look to the Supreme Court's consideration of a Seventh Amendment claim on direct review in *Jarkesy* as if it is the end-all-and-be-all. *Vape Cent. Grp.*, 2025 WL 637416, at *5; *Huff & Puffers*, 2025 WL 1092696, at *4. *Jarkesy*, for reasons explained, does not foreclose collateral review here.

Because Vaping Dragon will not receive meaningful judicial review absent this Court's intervention, the first *Thunder Basin* factor weighs in favor of jurisdiction.

### b. Is the claim wholly collateral to the statute's review provisions?

Next is whether Vaping Dragon's Seventh Amendment claim is "wholly collateral" to the FDCA's review provisions. *Thunder Basin*, 510 U.S. at 212 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)). Under *Axon*, a claim is necessarily collateral if it challenges the agency's "power to proceed at all." 598 U.S. at 192. That is precisely what Vaping Dragon is alleging in this case. If the Seventh Amendment entitles the company to a jury trial, then the company is also entitled to adjudication in an Article III court. *See Jarkesy*, 603 U.S. at 127; *see also Matter of Tex. Petroleum Corp.*, 52 F.3d 1330, 1336 (5th Cir. 1995) ("Whether an Article III court is necessary involves the same inquiry as whether a litigant has a Seventh Amendment right to a jury trial."). Or said another way, if Vaping Dragon prevails on its Seventh Amendment claim, the agency adjudication cannot proceed. *Wulferic*, 793 F. Supp. 3d at 845–46. The claim is therefore "collateral to any decisions [FDA] could make in individual enforcement proceedings." *Axon*, 598 U.S. at 195–96.

FDA resists this straightforward conclusion. Its argument goes like this: the FDCA allows the ALJ to enter a summary decision when there is no genuine dispute of material

fact.  Dkt. No. 12 at 17, 19; *see* 21 C.F.R. § 17.17(b).  "The Seventh Amendment is not even potentially implicated," however, "'unless and except so far as there are issues of fact to be determined.'"  Dkt. No. 12 at 19 (quoting *In re Peterson*, 253 U.S. 300, 310 (1920)).  Thus, "the manifestation of any Seventh Amendment claim depends on how the administrative proceeding unfolds."  *Id.*  Here, there is no indication of disputed facts, meaning Vaping Dragon's Seventh Amendment right (to the extent it has one) has not accrued.[7]  *Id.* at 17.

This argument is a red herring.  As explained fully below, the Court must decide whether this case "implicates the Seventh Amendment."  *Ortega v. Off. of the Comptroller of the Currency*, 155 F.4th 394, 402 (5th Cir. 2025).  If so, and assuming the public rights doctrine does not apply, Vaping Dragon is entitled to adjudication in an Article III court, with any outstanding fact issues decided by a jury.  *See Jarkesy*, 603 U.S. at 127–28.  As Chief Judge O'Connor explained, FDA's single-minded focus on factfinding may carry some weight "in an Article III court, but not in an administrative tribunal, where there are no jury trials."  *Wulferic*, 793 F. Supp. 3d at 845.  Moreover, *Axon* undermines FDA's position.  There too, the applicable regulations allowed ALJs to grant a summary decision in the agency's favor.  *See* 16 C.F.R. § 3.24 (2021) (FTC); 17 C.F.R. § 201.250 (2021) (SEC).  Yet the Supreme Court still held that the plaintiffs' Seventh Amendment claim was collateral to the statutory-review provision, despite the possibility that no disputed facts would arise.  *See Axon*, 598 U.S. at 192.  Therefore, under *Axon*, the collateral factor also favors the Court's jurisdiction.

### c.    Is the claim outside the agency's expertise?

Lastly, the Court considers whether Vaping Dragon's Seventh Amendment claim is "outside the agency's expertise."  *Thunder Basin*, 510 U.S. at 212.  "On that issue, *Free*

---

[7] To be clear, FDA does not argue that Vaping Dragon lacks standing or that its claim is not ripe.

*Enterprise Fund* could hardly be clearer." *Axon*, 598 U.S. at 194. There, the Supreme Court distinguished "'standard questions of administrative' and constitutional law" from "'considerations of agency policy.'" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 491). The former are within a district court's bailiwick; the latter implicate an agency's expertise.

Vaping Dragon's claim raises a pure question of constitutional law—it does not involve "distinctive knowledge" of federal tobacco policy that would favor review via the statutory scheme. *See id.* at 186. In fact, "agency adjudications are generally ill suited to address structural constitutional challenges" like the kind here.[8] *Carr v. Saul*, 593 U.S. 83, 92 (2021). Because the Seventh Amendment analysis "lie[s] outside [FDA's] core competence," *Space Expl. Techs. Corp.*, 151 F.4th at 772, the third factor (like the first two) weighs in favor of jurisdiction.

*          *          *

In sum, the Court has jurisdiction to resolve Vaping Dragon's Seventh Amendment claim. The "30,000-foot" analysis from *Axon* reveals that this case is more like those where the Supreme Court endorsed district court jurisdiction over collateral constitutional claims. 598 U.S. at 189. And application of the three *Thunder Basin* factors confirms this result. *See id.* The Court therefore proceeds to the merits.

## 4.    Analysis

The Seventh Amendment provides that in "[s]uits at common law . . . the right of trial by jury shall be preserved." Whether FDA's civil money penalty scheme triggers that

---

[8] Vaping Dragon notes that ALJs cannot invalidate federal statutes. Dkt. No. 21 at 14 (citing 21 C.F.R. § 17.19(c)). But *Axon* makes clear that Congress may have implicitly precluded district court jurisdiction "even if the agency itself" could not have resolved the claim. 598 U.S. at 190 n.2.

right requires a two-step analysis.  *See Ortega*, 155 F.4th at 402.  "The threshold issue is whether this action implicates the Seventh Amendment."  *Jarkesy*, 603 U.S. at 120.  If so, the Court then "consider[s] whether the 'public rights' exception to Article III jurisdiction applies."  *Id.*  If this action implicates public rights, then Congress may "assign [it] to an agency tribunal without a jury, consistent with the Seventh Amendment."  *Id.* at 119.

Applying *Jarkesy*, FDA's civil money penalty scheme undoubtedly implicates the Seventh Amendment.  And no public rights are involved.  Thus, before FDA can impose a civil money penalty, Vaping Dragon is entitled to a jury trial in an Article III court.

### A.    FDA's civil money penalty scheme implicates the Seventh Amendment.

The Constitution, as written in 1787, guaranteed jury trials only in criminal cases.  *See United States v. ERR, LLC*, 35 F.4th 405, 409 (5th Cir. 2022) (citing U.S. Const. art. III, § 2, cl. 3).  During the ratification period, the Founders debated whether to extend the same right to civil litigants, "at least as a matter of federal constitutional law."  *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 135 F.4th 683, 695 (9th Cir. 2025) (R. Nelson, J., concurring).  The lack of a civil jury right prompted some of the "strongest objections" to the Constitution.  *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446 (1830).  Indeed, the Founding generation grew tired of the English regulating commerce through "juryless admiralty, vice admiralty, and chancery courts."  *Jarkesy*, 603 U.S. at 121.  Core to these objections was the jury's role in combatting acts of Parliament restricting "the export of certain commodities, such as tobacco."  Matthew P. Harrington, *The Economic Origins of the Seventh Amendment*, 87 Iowa L. Rev. 145, 162 (2001).  So by 1791, the American people ratified the Seventh Amendment as part of the Bill of Rights.

The text of the Seventh Amendment guarantees the right to a jury trial for "[s]uits at common law." But the right is not limited to the "common-law forms of action recognized" in 1791. *Curtis v. Loether*, 415 U.S. 189, 192–93 (1974). "[T]he Framers used the term 'common law' in the [Seventh] Amendment 'in contradistinction to equity, and admiralty, and maritime jurisprudence.'" *Jarkesy*, 603 U.S. at 122 (quoting *Parsons*, 28 U.S. at 446). Therefore, the Amendment "embrace[s] all suits" that do not fall into those categories, "whatever may be the peculiar form which they may assume." *Id.* (alteration in original) (quoting *Parsons*, 28 U.S. at 447).

The civil jury right "extends to a particular statutory claim if the claim is 'legal in nature.'" *Id.* (quoting *Granfinanciera*, 492 U.S. at 53). In deciding whether a claim is "legal in nature," courts "consider the cause of action and the remedy it provides." *Id.* at 122–23. While courts must evaluate both factors independently, *In re Abbott*, 117 F.4th 729, 734 (5th Cir. 2024), the "remedy [is] the 'more important' consideration." *Jarkesy*, 603 U.S. at 123 (quoting *Tull v. United States*, 481 U.S. 412, 421 (1987)).

### i. Under *Jarkesy*, civil money penalties are a textbook legal remedy.

In *Jarkesy*, the Supreme Court considered whether the SEC can impose civil money penalties in a juryless in-house adjudication consistent with the Seventh Amendment. *Id.* at 115. At the first step of the analysis, the Supreme Court explained that "civil penalties" are "a form of monetary relief." *Id.* at 123. "While monetary relief can be legal or equitable, money damages are the prototypical common law remedy." *Id.*; *see Tull*, 481 U.S. at 422 (recognizing that "civil penalt[ies are] a type of remedy at common law that could only be enforced in courts of law"). Whether a monetary remedy is legal or equitable turns on its purpose. If the remedy "is designed to punish or deter the wrongdoer," then it is legal.

*Jarkesy*, 603 U.S. at 123.  But if it is meant to "'restore the status quo'" or "'serve a remedial purpose'"—for example, by "order[ing] a defendant to return unjustly obtained funds"—then it is equitable.  *Id.* (first quoting *Tull*, 481 U.S. at 422; then quoting *Austin v. United States*, 509 U.S. 602, 610 (1993)).

The SEC's civil money penalties, the Supreme Court held, fall into the former category.  *Id.*  The Justices based that conclusion on three characteristics of the applicable statutes.  First, federal law conditions the SEC's ability to impose civil penalties on six statutory factors—several of which "concern culpability, deterrence, and recidivism."  *Id.* at 123–24; *see, e.g.*, 15 U.S.C. §§ 78u-2(c), 80b-3(i)(3) (factors include the degree of misconduct involved, whether the defendant committed previous violations of securities laws or regulations, the need for deterrence, etc.).  "Because [these factors] tie the availability of civil penalties to the perceived need to punish the defendant rather than to restore the victim, [they] are legal rather than equitable."  *Jarkesy*, 603 U.S. at 124.

Second, the Supreme Court noted that the size of the available penalty also depends on the seriousness of the defendant's conduct.  *Id.* (citing 15 U.S.C. §§ 77h-1(g)(2), 78u-2(b), 80b-3(i)(2)).  Simple violations of a federal securities law or regulation warrant a "first tier" penalty.  *Id.*  But progressively serious offenses—if the defendant's violation involved fraud or manipulation, for example—result in a higher-tier penalty with a larger sanction.  *Id.*

The third and "final proof" is that the SEC need not return any civil money penalty to victims.  *Id.*  The Commission "can choose to compensate injured shareholders from the civil penalties it collects"; however, it "is not required to do so."  *Id.*  "Such a penalty by definition does not 'restore the status quo' and can make no pretense of being equitable."  *Id.* (quoting *Tull*, 481 U.S. at 422).

– 28 –

Taken together, these three characteristics reveal that the SEC's civil penalties "are designed to punish and deter, not to compensate." *Id.* at 125.  In other words, they are "a type of remedy at common law that could only be enforced in courts of law." *Id.* (quoting *Tull*, 481 U.S. at 422).  Accordingly, the Supreme Court held that the suit implicated the Seventh Amendment, thus entitling the defendants to a jury in an Article III court.

### ii.    FDA's civil money penalty scheme is indistinguishable from the one in *Jarkesy*.

As in *Jarkesy*, the remedy here is "all but dispositive." *Id.* at 123.  Just like the statutes governing the SEC, the FDCA directs ALJs to consider culpability, deterrence, and recidivism when determining the amount of a civil money penalty for a tobacco-product violation.  The ALJ "shall take into account," among other factors, the "gravity of the violation," the "degree of culpability," and any "history of prior . . . violations."  21 U.S.C. § 333(f)(5)(B).  And note that the FDCA permits "[e]nhanced penalties" for "intentional[]" violations, just as the SEC may impose a higher-tier penalty for more troubling conduct.  *Id.* § 333(f)(9)(B).  Lastly, the money FDA collects in civil penalty proceedings is "deposited as miscellaneous receipts in the Treasury of the United States."  21 C.F.R. § 17.54.  Like the SEC, FDA need not give the money to those harmed by the violation.  Accordingly, there is no material difference between the FDA's civil money penalty scheme and the SEC's.  *See Wulferic*, 793 F. Supp. 3d at 847.  Both are punitive, and both are legal in nature.

The Fifth Circuit recently applied the same analysis to reach an identical conclusion with respect to the Federal Communications Commission's civil money penalty scheme.  The question in *AT&T, Inc. v. FCC* was whether an in-house adjudication imposing a forfeiture order on AT&T violated the company's Seventh Amendment rights.  149 F.4th at 494.  Like the Supreme Court in *Jarkesy*, the Fifth Circuit "start[ed] with the remedy." *Id.* at

498.  The panel emphasized the FCC's civil penalty provisions—singling out the statutory factors requiring the Commission to assess the "gravity" of the violation, including whether it was willful.  *Id.* (quoting 47 U.S.C. § 503(b)(2)(E)).  And there too "the penalties [were] not remedial": the FCC pays its penalties into the Treasury, not to victims whose location data is compromised.  *Id.* (citing 47 U.S.C. § 504(a)).  "So, like the penalties in *Jarkesy*," the FCC's penalties are a legal remedy.  *Id.*  As in this case, "[t]hat 'is all but dispositive' of the Seventh Amendment issue."[9]  *Id.* (quoting *Jarkesy*, 603 U.S. at 123).

### iii.    The nature of the cause of action does not change the bottom line.

Putting aside the remedy, there is also the second consideration—the nature of the cause of action.  *See Jarkesy*, 603 U.S. at 122–23.  FDA argues that "[u]nlike the fraud in *Jarkesy*, an administrative TCA claim is not 'modeled on common law.'"  Dkt. No. 12 at 22 (quoting *Jarkesy*, 603 U.S. at 136).  That is not obvious.  Common-law fraud targets the misrepresentation or concealment of material facts.  *Jarkesy*, 603 U.S. at 125; *see Wesdem, LLC v. Ill. Tool Works, Inc.*, 70 F.4th 285, 291 (5th Cir. 2023) (identifying the elements of common-law fraud under Texas law).  The FDCA does something similar: it imposes liability on retailers who sell "adulterated" tobacco products that have seemingly been through the required premarket authorization process, but which in fact have not.  *See* 21 U.S.C. §§ 331(a), 387b(6).  That is, in essence, a misrepresentation of a material fact.

To be sure, the FDCA and common-law fraud are not "identical."  *Jarkesy*, 603 U.S. at 126.  But they do not need to be.  *See id.*; *AT&T, Inc.*, 149 F.4th at 499.  Courts only look

---

[9] The Fifth Circuit also rejected the FCC's argument that the public rights exception applies to its enforcement proceedings.  149 F.4th at 500–03.  Therefore, after *AT&T*, "Article III adjudication" with a jury "is mandatory" for FCC forfeiture orders.  *Id.* at 503.  Although the Supreme Court recently granted certiorari in *AT&T*, the case remains binding on this Court.

for a "close relationship" between the cause of action and a common-law analogue. *Jarkesy*, 603 U.S. at 126.  And even that is "not dispositive" of the Seventh Amendment question if, as here, the "action resembles a traditional legal claim." *Id.* at 135 (citing *Granfinanciera*, 492 U.S. at 52); *see supra*, Section 4.A.i–ii.

In any event, Vaping Dragon does not press this fraud-centric argument.  *See* Dkt. No. 3-1 at 6–8.  Instead, it points to a 1785 Massachusetts statute making it a crime to sell any "diseased, corrupted, contagious or unwholesome provisions," a 1787 South Carolina case holding that a person charged with selling liquor without a license was entitled to a jury trial, and a 1787 Pennsylvania decision granting a jury trial to a ship owner who faced statutory forfeiture of his vessel because he used it to transport goods without paying taxes. *Id.* at 9.  In Vaping Dragon's view, these examples show that "claims for the sale of 'adulterated' products . . . were being tried in courts of law by the time the Seventh Amendment was adopted."  *Id.*  FDA contends that the examples are irrelevant, either because they are historically inapposite or involve unrelated matters.  Dkt. No. 12 at 23–24.

The agency has a point.  The Massachusetts statute and South Carolina case involve criminal proceedings, which are "not affected by the [S]eventh [A]mendment."  *Cap. Traction Co. v. Hof*, 174 U.S. 1, 18 (1899).  The Pennsylvania case, for its part, implicates admiralty and maritime jurisprudence—areas squarely outside the Seventh Amendment's scope. *Jarkesy*, 603 U.S. at 122; Dkt. No. 12 at 24.  More broadly, all three examples have nothing to say about English practice.  *See Tull*, 481 U.S. at 417 ("[W]e compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity.").  Thus, Vaping Dragon's historical evidence, while

addressing "'the same basic conduct'" as the FDCA, is "deficient as an evidentiary matter." *Wulferic*, 793 F. Supp. 3d at 847 (quoting *Jarkesy*, 603 U.S. at 125).

In the end, "the relationship between the [FDCA] and a common law analogue is not as obvious as it was in *Jarkesy*." *AT&T, Inc.*, 149 F.4th at 499.  But ambiguity on that score does not change the outcome.  Remember: "[T]he relief sought is '[m]ore important' than finding a precisely analogous common-law cause of action." *Tull*, 481 U.S. at 421 (quoting *Curtis*, 415 U.S. at 196).  As explained, FDA's civil money penalty scheme is a textbook legal remedy.  Accordingly, the Seventh Amendment entitles Vaping Dragon to a jury trial in an Article III court, unless the public rights exception applies.

### B.    The public rights exception does not apply.

Although FDA's civil money penalty scheme implicates the Seventh Amendment, the agency argues that a jury trial is not required under the public rights exception.  Dkt. No. 12 at 20–22.  Under this exception, the Seventh Amendment poses no obstacle to agency adjudication.  But this case does not deal with public rights.  So Congress cannot circumvent the jury trial requirement by channeling it to an agency tribunal.

"The public rights doctrine is an 'area of frequently arcane distinctions and confusing precedents.'" *Ortega*, 155 F.4th at 402 (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 583 (1985)); *see Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (recognizing that the Supreme Court "has not 'definitively explained' the distinction between public and private rights," nor have its precedents in this area "'been entirely consistent'" (quotations omitted)).  That said, the Supreme Court has identified a few matters that "historically could have been determined exclusively by [the executive and legislative branches]." *Jarkesy*, 603 U.S. at 128 (alteration in original) (quoting *Stern v.*

*Marshall*, 564 U.S. 462, 493 (2011)).  These include "revenue collection, foreign commerce, immigration, tariffs, tribal relations, public lands, public benefits, and patents."  *AT&T, Inc.*, 149 F.4th at 500.  However, because the public rights doctrine is an atextual exception to Article III, its application must be closely scrutinized.  *Jarkesy*, 603 U.S. at 131.  So "[e]ven with respect to matters that arguably fall within the scope of the 'public rights' doctrine, the presumption is in favor of Article III courts."  *Id.* at 132 (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 69 n.23 (1982)).

Here, FDA contends that the public rights exception applies because its civil money penalty scheme implicates public health.  Dkt. No. 12 at 20.  This argument lacks merit.  To begin, the Supreme Court in *Jarkesy* did not identify public health as a recognized category of public rights.  *See* 603 U.S. at 130.  Nor has the Fifth Circuit in its post-*Jarkesy* cases.  *See, e.g.*, *Ortega*, 155 F.4th at 402–03; *AT&T, Inc.*, 149 F.4th at 500.  At most, FDA can point to *Crowell v. Benson*, which included public health in a list of matters sometimes assigned to administrative agencies.  285 U.S. 22, 51 (1932).  But "*Crowell* itself concerned the administration of public lands"—it did not purport to recognize public health as a distinct category of public rights.  *Wulferic*, 793 F. Supp. 3d at 849 (citing *Jarkesy*, 603 U.S. at 130).

*Crowell*'s apparent example of a public health case, *Houston v. St. Louis Independent Packaging Co.*, does not help FDA as much as it thinks.[10]  249 U.S. 479 (1919); *see* Dkt. No. 12 at 20.  There, a sausage manufacturer challenged the Secretary of Agriculture's authority to make factual findings for enforcing a labeling regulation under the Meat Inspection Act. 249 U.S. at 479, 483.  As FDA concedes, "*Houston* did not involve a defendant in an agency

---

[10] The Supreme Court listed *Houston* in an 11-case string cite in a footnote.  *See Crowell*, 285 U.S. at 51 n.13.  That footnote contains no analysis, let alone any indication that *Houston* clearly placed public health within the public rights doctrine.

enforcement action."  Dkt. No. 22 at 11 (internal quotation marks omitted).  And the case said nothing about Article III adjudication, the Seventh Amendment, or public rights.  *Houston* is, at most, "an example of an executive official exercising delegated legislative authority."  *Wulferic*, 793 F. Supp. 3d at 849.  Thus, it does not do the work that FDA wishes.

Next, the agency contends that *Oceanic Steam Navigation Co. v. Stranahan* confirms Congress' power to authorize civil money penalties without a jury trial.  214 U.S. 320 (1909); *see* Dkt. No. 12 at 22.  Not so.  *Oceanic Steam* blessed the imposition of an administrative penalty on a steamship company that violated federal immigration law by facilitating the entry of aliens with "loathsome or dangerous contagious diseases."  214 U.S. at 332–34.  But *Jarkesy* cabined *Oceanic Steam*'s analysis to "Congress's power over *foreign* commerce."  603 U.S. at 129 n.1 (emphasis in original); *see Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F.4th 121, 130 (3d Cir. 2025) (noting that "*Oceanic Steam* related closely to the admission and exclusion of aliens") (Hardiman, J.).  By contrast, Congress passed the FDCA pursuant to its authority over *interstate* commerce.  *United States v. Walsh*, 331 U.S. 432, 434 (1947).  *Jarkesy* leaves no doubt on this distinction: "Nowhere does *Oceanic Steam Navigation* say that the public rights exception applies to cases concerning . . . interstate commerce more broadly."  603 U.S. at 129 n.1.

Lastly, FDA's attempt to shoehorn public health into the public rights doctrine risks "blow[ing] a hole in what is meant to be a narrow exception to Article III."  *AT&T, Inc.*, 149 F.4th at 500.  Countless areas of federal regulation can be said to promote public health.  If disputes involving those disparate matters could be categorically assigned to an agency that simultaneously functions as the "prosecutor, judge, and jury," the Seventh Amendment's

promise of a "neutral adjudicator" would mean little.  *See Jarkesy*, 603 U.S. at 140.  Given

the presumption in favor of Article III courts, the continued debate over the vitality of the

public rights doctrine,[11] and the fact that public health is not an entrenched category of

public rights, the Court concludes that the public rights exception does not apply.

*          *          *

The civil jury right is "of such importance and occupies so firm a place in our history

and jurisprudence that any seeming curtailment of the right" must "be scrutinized with the

utmost care."  *Jarkesy*, 603 U.S. at 121 (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)).

FDA's civil money penalty scheme implicates the Seventh Amendment because it provides

a quintessential legal remedy.  And the public rights exception does not otherwise permit

agency adjudication.  Thus, Vaping Dragon is entitled to a jury trial in an Article III court.

### 5.    Remedies

That leaves the remedies.  Vaping Dragon seeks injunctive relief and a declaratory

judgment.  Dkt. No. 1 ¶ 60.  For the reasons below, it is entitled to a permanent injunction

but not declaratory relief.[12]

---

[11] Vaping Dragon questions whether the public rights doctrine "still exists" post-*Jarkesy*.  Dkt. No. 21 at 18.  The Fifth Circuit recognizes that it does.  *See, e.g.*, *AT&T, Inc.*, 149 F.4th at 500.  No doubt, most of the *Jarkesy* Court criticized the doctrine.  *See Jarkesy*, 603 U.S. at 136–40 & nn.2–4; *id.* at 158 (Gorsuch, J., concurring).  And those Justices were particularly suspect of its application in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, which held that OSHA could impose civil penalties in an administrative tribunal.  *See* 430 U.S. 442, 450 (1977).  While FDA does not rely on *Atlas Roofing*, *Jarkesy* still holds that courts should think twice before extending the public rights doctrine any further.

[12] Vaping Dragon also requests attorneys' fees and costs.  Dkt. No. ¶ 60.  At this time, the Court denies the company's request without prejudice to it filing an appropriate motion after final judgment.  *See Wulferic*, 793 F. Supp. 3d at 852.

### A.    Permanent Injunction

Vaping Dragon prevails on each permanent-injunction factor.  *See Valentine*, 993 F.3d at 280.  As explained, Vaping Dragon has shown actual success on the merits of its Seventh Amendment challenge.  Moreover, it faces irreparable harm without an injunction.  The "here-and-now injury" of subjection to an unconstitutional proceeding cannot be undone after the fact.[13]  *Axon*, 598 U.S. at 191 (quoting *Seila Law*, 591 U.S. at 212); *see AT&T, Inc.*, 149 F.4th at 503.  And "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)).

The last two factors—the balance of hardships and the public interest—merge when the government is the defendant.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  FDA urges the Court to consider the "public-health purpose" of its tobacco-control provisions.  *See* Dkt. No. 12 at 28 (quoting *Big Time Vapes*, 963 F.3d at 438).  But those concerns, while valid, cannot overcome the public interest in enforcing the Constitution.  After all, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)).  Vaping Dragon has therefore carried its burden on each permanent-injunction factor.

Next, consider the scope of the injunction.  Vaping Dragon seeks in part an "order prohibiting HHS and FDA from adjudicating civil money penalties in administrative

---

[13] Legal remedies are also inadequate.  "Because [Vaping Dragon] sue[s] the government, money damages are off the table."  *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780, 804 (N.D. Tex. 2024) (citing *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021)).

proceedings." Dkt. No. 1 ¶ 60(g).  That is, Vaping Dragon asks the Court to enjoin the defendants from seeking administrative penalties against *anyone*.  *See id.*  But the company does not explain how a universal injunction is necessary to afford it "complete relief." *Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025).  Nor is it otherwise clear: Vaping Dragon is the only plaintiff before the Court.  *See id.*  Thus, to provide complete relief to Vaping Dragon and to ensure that the injunction is "no more burdensome to the defendant[s] than necessary," the Court's injunction need only reach FDA's proceedings against the company. *Id.* (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

The Court thus enjoins the defendants from adjudicating civil money penalties against Vaping Dragon in an administrative proceeding and enjoins them to dismiss with prejudice the administrative complaint against the company.

### B.     Declaratory Judgment

The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.*  Federal courts have "discretion in determining whether and when to entertain an action under the Declaratory Judgment Act," even when the suit satisfies the "jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

The Court declines to enter declaratory relief here.  "Ample precedent establishes that [a court] should not exercise [its] discretion to extend declaratory relief when a challenged law or policy no longer affects the plaintiff." *Texas v. EEOC*, 933 F.3d 433, 451–52 (5th Cir. 2019).  Because the Court enjoins the defendants from adjudicating civil money

penalties against Vaping Dragon in an administrative proceeding, a declaratory judgment would be redundant and provide no further relief to Vaping Dragon. *Id.* at 451 n.38. *See, e.g.*, *Texas v. Garland*, 719 F. Supp. 3d 521, 599 (N.D. Tex. 2024) (Hendrix, J.) (declining the plaintiff's request to extend declaratory relief in addition to a permanent injunction), *rev'd and vacated on other grounds sub nom.*, *Texas v. Bondi*, 149 F.4th 529 (5th Cir. 2025)*, reh'g en banc granted and vacated*, __ F.4th __, 2026 WL 110948, at *1 (5th Cir. Jan. 14, 2026).

### 6.    Conclusion

In sum, the Court has jurisdiction to resolve Vaping Dragon's collateral challenge to FDA's civil money penalty scheme. That scheme implicates the Seventh Amendment, and it has nothing to do with "public rights," which do not require a jury trial. Accordingly, Vaping Dragon is entitled to a jury trial in an Article III court. The Court therefore denies the defendants' motion for summary judgment (Dkt. No. 11), converts Vaping Dragon's motion for preliminary injunction into a motion for summary judgment (Dkt. No. 3), and enters final judgment for Vaping Dragon on the merits. The defendants are permanently enjoined from adjudicating civil money penalties against Vaping Dragon in an administrative proceeding. Thus, the defendants are also enjoined to dismiss the administrative complaint against the company with prejudice. Vaping Dragon's request for a declaratory judgment is denied as redundant.

So ordered on February 2, 2026.

_James W. Hendrix_
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE